Thank you, Counsel. We will take the case under advisement and call our next case, People Against Police Violence at Al v. City of Pittsburgh. They have pleased the court. My name is Yvonne Hilton. I represent Appellant City of Pittsburgh in this matter, and I would request two minutes of rebuttal time. That's grand. Thank you. We are here today to challenge a determination by the District Court that Appellees, People Against Police Violence, were prevailing parties after being awarded a TRO preliminary injunction. Attorneys' fees in this country are the exception rather than the rule. There are two judicially sanctioned times when it is appropriate to award such fees. The first is if you receive a judgment on the merits, and the second is if there is a judicially enforced settlement or consent decree. Neither are present in this case. In fact, just this year, the Supreme Court's decision of Sewell v. Weiner further limited one's rights to collect attorneys' fees where the relief awarded was preliminary. It was a preliminary injunction that was followed either by – that was either reversed, dissolved, or otherwise decided against the judgment in the same case. But we don't have that here, do we? We have a preliminary injunction, a TRO finding an ordinance unconstitutional, the court putting in place an injunction that set forth parameters for conduct, and a complaint that remained pending, and an eventual dismissal based upon the passage of a new ordinance. How do we have a reversal or failure as is in the Sewell case? Well, I think the similarity is that in our case, the injunction was lifted upon the passage of the city's new ordinance. So that was a successful outcome, correct, not an adverse outcome for the plaintiffs? Well, I would argue that it's a separate issue. The interim relief that they received was ephemeral. It was very similar to Sewell in that the final ordinance actually is different, has some – for example, there are cost recovery provisions that are in the ordinance that are different from the interim provisions. The time period for the city to respond to requests is different than in the interim requests. Counsel, I'm sorry. No, go ahead. One thing I still want to – and it may go to another issue that you've raised, but October 31st, a TRO is issued. Correct. November 25th, I think, the preliminary injunction that you were talking about is issued, which has all the details. Then there's a motion made on February 24th, I think, your ordinance is repealed, and it's repealed effective March 9th, I think. Correct. Literally, I think the day or the day after that's repealed, you make a motion to dismiss the entire case, and your motion is made on the basis that there's no ordinance anymore. You said there's no ordinance. That's your position. There's no ordinance. Therefore, there's nothing justiciable before the court. Let me finish the question first. On the 27th, you have a hearing. I just have one question, although it's a fairly complicated one. In your view, did Pittsburgh, the city of Pittsburgh, consider that as a repeal of that ordinance? Anybody could hold a parade anywhere they wanted. They didn't need any permission. They could just march around anywhere they wanted, or that Pittsburgh was still going to operate a permit system. It's just they wouldn't have that ordinance anymore. You'd now be operating a permit system with no ordinance. As I read the record, you fully intended to continue operating a permit system, and there was some evidence on the 27th to that extent. Your Honor, what's important is back at the original TRO hearing, the city came in and said we're not enforcing 603. The fact that it was finally repealed on the books. But the evidence in the 27th hearing is you clearly were enforcing it. You were still handing out notices. As late as the day before the hearing, you were handing notices to people about cost recovery. Your Honor, we were required to do that under the terms of the court's TRO. Not for a court. You were violating. You admitted. Indeed, your own attorney, who represented Pittsburgh, said this doesn't look good for us, and said that in the transcript. There was a ministerial error insofar as the original order of court said— It's a darn frightening ministerial error to someone who's handed a notice that basically says he can't hold his parade. That's some ministerial error. Well, your Honor, if we go back to the first TRO hearing where the trial— Could you stick to my question for a moment? Were you intending, after you repealed the ordinance, to continue operating a permit system? It's just that there wouldn't be an ordinance. It would be a permit system without an ordinance. Well, yes. We had, but that was before the TRO hearing. We had started— The answer is yes, which means that you weren't going to tell people. We no longer have a permit system. Go march to your heart's content. You were not going to do that. No. There were public safety reasons. Well, I understand that, but you were going to run a permit system, but you were just going to run it without an ordinance. There was nothing in place. Right? There was nothing in place. The ordinance was repealed, and there were no standards, which under Thurston is problematic. So after the evidence was adduced, you consented to an injunction containing ordinance bells and whistles. Correct? And did not pursue the motion to dismiss, did not file any appeal, but consented to the entry of an injunction, did you not? At that time, we did, Your Honor. However, we would not agree that there were— The issue of whether there was an unwritten system, there was a system in place. The $68 fee and the $21 fee that was continued by the trial court in her CRO was already in place. There was an application process. Well, but once the ordinance was repealed, there was nothing in place. There could not be anything in place. Could there be? We still had, and this is part of the reason why it's so important to have a finding on the merits. But there was a merits finding that the ordinance was unconstitutional. Yes, but the city didn't object to that. So under Buckhannon, we were already voluntarily had said we were starting a new ordinance. We had agreed that we weren't going to apply it anymore, and in fact, we didn't apply it. Well, you did apply it. You tried to. We didn't try to apply— There was evidence introduced that you tried. Well, Your Honor, there was in the interim of having found that 603 was not something that the city wanted to proceed with, we still had to have something in place. That's why we agreed to the interim permitting process, which did not speak to anything other than there's a $21 fee for sidewalks, there's a $68 fee for parades. You're losing me. You tried to get the case dismissed on the 27th. You later, when the court wouldn't do it—the court was somewhat outraged, in fact, but the court wouldn't do it—then you consented to whatever the kind of modified injunction they put in place. But your effort was, at that point, what you tried to do was get the whole case thrown out. In your brief, you even challenged the refusal of the court to do that. You wanted the case thrown out, and yet you wanted to continue operating a permit system where there was no ordinance, no standards of any kind. Well, Your Honor, again, that's why the city never had a chance to put on a case about whether the alleged— whether the fact that there were no written standards in place at the time does not necessarily equal a finding that anyone would receive harm, that there was unbridled discretion. I mean, that's something that would have needed to go to a final finding. The city had the right to defend that. This was just an interim period. We were in the process of enacting a new ordinance. So, yeah, there was a period. How long did it take to enact a new ordinance? You started prior to this suit, allegedly. You started sometime before October of 2003 to draft a new—and you passed it in 2006? Your Honor, I believe it was passed in 2004, and the regulations intending it were passed soon after that. But part of the reason that it— We have—the evidence that we have showed it was in January of 2006, the ordinance—the new ordinance was passed. Isn't that correct? I think they were operating under the court's order in the meantime. Isn't that correct? Of February 27, her order. That's right, Your Honor. That's three years, at least three years. Well, no, because they said in another place in the record that they were trying before this case started. Before October of 2003, they were trying sometime before then. In fact, they talked about even going back to 1996 and 1997, they said they weren't even enforcing the ordinance. They said it, but— Your Honor, that was part of the plaintiff's—CAPD's verified complaint. That's not— How long does it take to prepare a new ordinance on this subject? I will say that the ordinance, there were a couple years, obviously, while we had an interim permitting process, but that's not the standard that this court needs to look at. It needs to look at whether there was a judgment on the merits that the enforcement was there, and that's not what we have to give plaintiffs' CAPD prevailing rights status. How do we not have a judgment on the merits when the suit was to declare the ordinance unconstitutional? Well, we have a couple things. The court—and, again, everything here happened at that first TRO hearing. You had a TRO hearing where the court came in. The evidence before the trial court was the plaintiff's verified complaint and argument. And that's it. So we have a one-sided situation, and right away the city comes in and said, we're not enforcing 603, regardless of the date of repeal. We're not enforcing 603. But a declaration by counsel that something isn't being enforced is not a conclusive determination as to constitutionality or— Correct, Your Honor. That's why we say there's no relief stemming from the finding that 603 was not unconstitutional. It was constitutional. No, that it was okay to repeal it. The city was never contending that 603—we didn't object to the finding that it was unconstitutional because we said we're not enforcing it and we're drafting it in. Tell you, I'm surprised that after the ordinance wasn't—I mean, it's one thing to say not a prevailing party, and I think under the case law that's tough, but you can tell me differently. But I'm surprised that there wasn't a contention here that after the repeal and the ordinance and the injunction that perhaps those fees would not be due, that, in fact, there was no role for plaintiffs to play. But I don't see that contention in your brief.  Well, yes, I believe, Your Honor, that counsel—that in the fourth point, counsel speaks to what was fees awarded for PAPB's counsel's consideration of what the new ordinance is, and that has nothing to do—our position would be that if this court is inclined to find that there's a prevailing party, and we're not conceding on that point because we don't see that there's a final decision on the merits in their favor. Anything—603, we agree that it's unenforceable. You've added the word final. The phrase decision on the merits may not under case law have to be a final judgment in the sense of means finality for telepurposes. Clark— This has to be a judgment on the merits, not necessarily a final judgment on the merits. But that judgment on the merits has to be something that at the end of the day that someone can walk away with and enforce. I mean, this is very different from the truth here. Let me throw you an underhand pitch. From starting February 27th and going on to 2006, counsel for defense, and you for that matter, were in court on many occasions negotiating the terms of the new ordinance. You'd even have hearings as to whether a particular clause would be or would not be constitutional. In effect, the process of creating the ordinance took place to some degree in the courtroom with briefing and discussion. What's your position on those fees? Not fees that's seeking to prevent, you know, it's being enforced, the existing ordinance, or not fees dealing with enforcing her order of February 27th, but rather fees relating to what should or should not be in this hoped-for new ordinance, which finally came into being in 2006. What's your opinion on those fees? Your Honor, here's why we find that the PAPD was a prevailing party. Our position is that the only fees that they're entitled to would be from the first TRO hearing, in which there was a decision about 603 and the interim status. The bulk of the fees, if you look at the timesheets, are between the second preliminary injunction hearing and the third preliminary injunction hearing. And that goes to— So what period is that? From 11— Twenty-five was the— Twenty-five of three to— 227. But I'm asking about from 11-27-2004— 227. 227, excuse me. 227-04, basically forward, most of which appears, to the extent we can tell, I can tell, is that to deal with negotiating the new ordinance. The argument is the same, Your Honor. They're not— What's your position on that? They're not entitled to fees— Why? Because they had—because that wasn't part of the release that they were entitled to. They—even if you would find they were prevailing on the first two issues, they're not prevailing in terms of what the city came up with for its final ordinance. The legislative process is that. They were really—notwithstanding the fact that the trial court did not allow us out of the case and we participated in the process, the city is not under any obligation. Even today, we could change our ordinance, obviously, and we're not bound by the suggestions that PAPB counsel gave. Except in their prayer for relief, they asked the court to afford what additional relief is necessary to protect their constitutional rights, which would seem to me to include having an ordinance in place that passes constitutional muster. Absolutely, Your Honor, but that's what 471 was. The fact is it's still a separation of powers. The city is not under an obligation to keep 471 in place for— We'll hear from you on rebuttal. All right, we'll hear from you on rebuttal. Thank you, Your Honor. Thank you, Your Honor. May it please the court, Vitol Valchak from the American Civil Liberties Union of Pennsylvania on behalf of Appalese in this case. First of all, I want to come back to the complaint and what this lawsuit was all about because I think it informs the other issues that this court has raised. This was not a challenge to a narrow ordinance. This was a challenge to the city of Pittsburgh's permitting process. When you look at the complaint, whether you start with the introduction, you look at the details of the history of the application, you look at the specific problems that we enunciated, which is extended advance application provision, no specific turnaround time for the city, all sorts of fees, which were very burdensome, and no procedural due process at the end of the day after you get some kind of decision. What we see is the city coming in and saying, oh, no, no, no, we're not going to enforce that at all, as the court has pointed out. And then the city continues to insist on various aspects of what they had been doing that we alleged was unconstitutional. One of the specific things that we talk about in that complaint, it is in the prayer for relief. Not only do we ask the court to declare unconstitutional and enjoin Chapter 603, but we say you can't charge what the city calls cost recovery. So that's police and public works security fees that are somehow indexed to how much the city spends. You cannot have these insurance requirements. You cannot have the indemnification. And if the court looks at every transcript in the hearings, the city continues to argue for that cost recovery. And, in fact, at the February 27, 2004 hearing, the court has the little mini-hearing within the bigger hearing and is, I think indignant is a fair term, finds out that, in fact, the city has refused to give a permit to the anti-abortion group that wants to hold the protest, was refusing to give a permit to anti-war protesters because they didn't apply 45 days in advance when, in fact, the court's injunction said you can't require more than seven days. And then somebody else who had applied that week, the week of the February 27 hearing, who was given a letter saying you can't get a permit until you prepay all of the costs. So, I mean, there is no question that you've got a case in controversy going throughout these proceedings. And when you, in fact, look at the very end of this case, you look at the status conference in August of 2005, the city comes in and says, Your Honor, we've now passed this ordinance. I do believe, to answer the court's question, that the ordinance was actually passed in 2005. To be effective later? Well, but it's not effective because there is an injunction. And so the city, I mean, I think what happened is that the city is enforcing many provisions which the plaintiffs said, You know, this is good. You fixed these problems from what you were doing before in terms of advance notice requirements. But what we were still fighting over is some of the cost recovery provisions. And the last provision, in fact, that we were fighting over was the city's insistence that they be allowed to assess insurance in situations where the protesters are going to number more than 5,000. So by this time, they had dropped every other what we found to be constitutional objection. And it wasn't until February of 2006 when they finally agreed that they were not going to assess insurance in any First Amendment type of protest that we said, Good, all right, we think you now have a permitting process that has cured all of those unconstitutional aspects that we raised in the complaint. Was that embodied in an ordinance that subsequently passed? There is an ordinance. And most of what we were negotiating over were regulations, implementing regulations, which are available on the website. And if the court were to go and look at it, I don't believe the actual ordinance and the regulations are in the record before the court. All of these constitutional problems, which we challenged in October of 2003, have now been cured. I'd like to come back to Judge Rendell's question about the entitlement to fees after February 27th. And I guess, first of all, I think it's important to note that the city's attorney, in fact, conceded that there was a merits determination made at one of the first two hearings, certainly the first hearing. She's simply saying that's not a final determination, I think, as the court has noted. And as every circuit has held, you can get fees for an interim order as long as it's merits-based, and certainly this circuit has held that. The third injunction- As long as it's merits-based and not subsequently found to be not entitled. Correct. As the court pointed out in Soll v. Weiner, if it is reversed on the merits, and the court said that is of controlling importance, and in addition, the other aspect of prevailing party is did you win anything?  And at the end of the day, the statute is still there. It's still being enforced. So not only did you have a reversal on the merits, but they didn't actually win anything in that case, which is very different from what we have here. The third injunction on February 27th in this case, you could say it's a merits injunction. We had a full day of testimony. At the end of the day, the city comes in and stipulates to it. All right, so then you're under the Truesdale test, and certainly we meet the four-part test of Truesdale. Thereafter, we are still fighting on the same issues that we raised in 2003. The complaint was still pending. The complaint is still pending. The controversy is the city going to continue to use or apply a permit process where they have some of these unconstitutional aspects? That's still being negotiated. And the entitlement to- Counsel, you had an injunction in place on February 27th. So until something happened, that injunction was enforced, and you could have come in if the city violated that injunction. But what I have to confess troubles me. Maybe it's when the third grade might have heard the phrase separation of powers for the first time. It wasn't before February. The notion of court and counsel negotiating, not that you weren't right. I'm not questioning the kind of rightness or wrongness of anybody's position from a legal point of view, but the notion that we have a judge and two lawyers in the judiciary negotiating what the new ordinance will be. Of course, there's a full range of what might be constitutional. It's not like only one constitutional ordinance. There could be a variety of ordinances that might pass constitutional muster. And that is what- it's those- I mean, you could have just rested on your injunction and, you know, stayed in force until the city got around to passing a new ordinance. If you didn't like the new ordinance and they moved to dismiss the injunction as being moved now because of the new ordinance, you could say, no, it's not moved because this new ordinance is also unconstitutional, facially or otherwise. But you didn't do that. What you were doing and what the judge was doing was, in effect, engaging in- you know, Judge King in the state court of New Jersey was assigned by the Supreme Court to test a certain drunk-o-meter kind of thing. And he used to put when he was standing- he would put legislature in session on the outside of his door. I feel like in the courtroom they're going to put this sign that Judge King uses, which is legislature in session. Your Honor, I certainly understand what you're saying, but I think calling what the court did legislating here is inapposite. It really does not apply. If you look at just what happened from October 31st to February 27th, all right, you have the court enjoining or holding unconstitutional the existing ordinance. Then there is no ordinance. And the city's trying to get it right. And what they come back with clearly contains some of the unconstitutional- No, there's no ordinance, but you have an injunction. Right. The city's still trying to operate a permit system. That was my very first question. Not that they said nobody needs a permit. Just go marching. They were still trying to operate a permit system. And your injunction on the 27th controlled what they could do during that period. So you were protected during that period if they tried to put insurance requirements, cost recovery requirements, long waiting periods. That's all covered. Your Honor, and they could have either appealed the injunction or they could have moved to dismiss it. But they didn't. No, so what happens, Your Honor, is we have this injunction in place. And the city keeps coming to us with new ordinances. I mean, we were invited by city council to come and discuss proposed ordinances. And they say, does this satisfy the injunction? Presumably you're trying to make the complaint go away. You're trying to settle the complaint. We are trying to help the city pass an ordinance that doesn't run afoul of all the unconstitutional provisions. Now, Your Honor, I know this is, it may be unorthodox, but it is in fact pretty much conventional in terms of dealing with systemic relief. When you file an injunction to try to fix a housing authority, when you try to fix a child welfare system, it's not always such a. It's like a consent decree. It is exactly like a consent decree. And it's no different than if you look at Pennsylvania versus Delaware Valley, the Supreme Court case where you're dealing with trying to get the state to fix Clean Air Act provisions. Or you deal with Daggett versus Kimmelman when you have redistricting. And I just found out. Daggett's different. Daggett is, redistricting is something I was involved in, so I'm familiar with Daggett. But again, Your Honor, there's an injunction. But Daggett, you had to go forward. You had no choice. You had to hold elections. And there was time pressure in Daggett. And the court invited a – when the legislature refused to file a redistricting plan, the court basically said, you counsel, present one, and then we'll implement that. That really is a difference. But, Your Honor, with all due respect, I don't think that's any different because the court says this is unconstitutional. Now, legislature, you fix it. And the court – and the legislature was unable to fix it, so the court then superintended the process, which is what happened here. I guess you're saying that ultimately there had to be an ordinance, that there had to be an ordinance in place. And even though there was an injunction that was the stopgap measure in the interim, that isn't supposed to last forever. Correct, Your Honor. And let me just point the court to an August 6th decision out of the Seventh Circuit, which I think is directly on point in terms of this – I guess you could call it post-judgment monitoring or consent order monitoring. Is this a fee case? It is a fee case. It's GAUTRAU, G-A-U-T-R-A-U-X, versus Chicago Housing Authority. It's at 491 F. 3rd, 649 Seventh Circuit. And in that case, it did involve a consent decree trying to fix discrimination in Chicago's housing authority. And in that case, what the Seventh Circuit looked at was that in deciding that they were prevailing parties entitled to fees for activity that took place after the consent decree was implemented. And they said the agency had filed a motion to lift the decree. The agency had gone to the plaintiffs in that case and asked for selective waivers of the decree, which was operating as an injunction, which is exactly the situation we have here with the Three Rivers Regatta and the Grand Prix. The city came and said, we have this injunction. We can't get fees. Will you lift this? And we looked at it and we said, yeah, you know, this isn't a First Amendment event. It's a commercial kind of event. Of course, you can collect fees. You can assess insurance. So there was a selective waiver. And ultimately, what the court at 658 said, that the Chicago Housing Authority had to change its position to win plaintiffs' approval of the waiver orders. And what the consent decree did there was gave plaintiffs control to help steer the process where it's constitutional. And the court said that is certainly relief that the plaintiffs can recover and that they are prevailing parties in that situation. If there's no further questions from the court. Thank you, counsel. Nothing further. Thank you. Your Honors, I'd just like to remind the court that Seoul does not somehow overrule Buchanan. And the fact is that PAPV might love to say that the catalyst theory, what they're trying to argue is the catalyst theory in a sense. We came in. We voluntarily said, OK, no 603. We voluntarily agreed to this interim, to writing what was an interim permitting system. But again, we don't only look at what the plaintiffs won. We look at what point it is that they won it. This relief was granted at the TRO level. The evidence of record was PAPV's verified complaint. And this is even highlighted in their brief. And when you look at the counterstatement of facts in this case, there are 61 plaintiffs. 21 of these go to the verified complaint. The remainder go to pleadings and colloquy of court and discussion of counsel. There's one reference to any testimonial evidence. The district court did not implement a remedy here. She never ordered us to adopt any one provision or another. So there was no need for counsel's input to kind of go to your question, Judge Arenas, any time after the TRO. That, the court ordered us to do it. The city participated. But we did move for dismissal of the case. The city never even filed an answer here. And the judge, the trial court, only dismissed it as moot, the injunction as moot, once the city passed its new ordinance. You never filed an answer of any kind? We never filed an answer. Does that mean you admit everything that's in the complaint? Absolutely not. It means we didn't have a chance to get a judgment on the merits regarding unbridled, if there was some kind of unbridled discretion involved with the penalty. It wasn't, it's not what makes them a prevailing party. The idea of awarding attorney's fees to a plaintiff for obtaining only preliminary relief is essentially establishing a requirement that local and state governments are going to pay the costs of the opponent when they haven't been shown to do anything wrong. Thank you. Thank you. Thank you, counsel. The case is well argued. We'll take it under advisement and ask the clerk to recess court.